UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-10397-RGS

CONSERVATION LAW FOUNDATION, INC. &
CHARLES RIVER WATERSHED ASSOCIATION, INC.

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ET AL.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS

March 24, 2017

STEARNS, D.J.

This case tests the limits of a federal court to require an agency of the

executive branch to do something that it is has decided not to do, no matter

how compelling might be the circumstances.  Plaintiffs Conservation Law

Foundation, Inc., and Charles River Watershed Association, Inc., brought

this citizen suit under the Clean Water Act (CWA) against the Environmental

Protection Agency (EPA), the EPA's Region 1 Office, Gina McCarthy (EPA's

Administrator at the time the lawsuit was filed), and H. Curtis Spalding (the

Regional Administrator of the EPA's Region 1 Office), contending that the

EPA[1] has abdicated a nondiscretionary duty to require stormwater

---

[1] For the sake of simplicity, defendants will be referred to collectively as "the EPA" throughout this opinion.

dischargers along the Charles River to apply for pollution discharge permits. The EPA now moves to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim. Fed. R. Civ. P. 12(b)(1), (6). After a hearing on the motion to dismiss, plaintiffs moved to amend the Complaint, seeking to add a claim that the EPA has failed to respond to a petition that plaintiffs filed in 2013 seeking designation of a number of stormwater point sources. The EPA opposes the motion, chiefly contending that amendment would be futile.

BACKGROUND

The relevant facts are largely undisputed, but the parties vigorously disagree over their fit in the overarching regulatory framework. Under the CWA, each state is required to set water quality standards for bodies of water within its boundaries. 33 U.S.C. § 1313(c). Once these standards are defined, the state determines which water bodies do not meet the quality standards for each of a list of pollutants. *Id.* § 1313(d)(1)(A). If a pollutant exceeds the acceptable level, the state must then establish the "total maximum daily load" (TMDL) of the pollutant that the water body can absorb and still meet water quality standards. *Id.* § 1313(d)(1)(C).

TMDLs allocate the daily load between point sources (such as a pipe or ditch, *id.* § 1362(14)) and all other sources, creatively referred to as nonpoint

sources.  A TMDL is the sum of acceptable "wasteload allocations" from point sources and "load allocations" from nonpoint sources.  40 C.F.R. § 130.2(g)-(i).  Once a TMDL is designed, it is submitted to the EPA for approval.  33 U.S.C. § 1313(d)(2).

A separate section of the CWA establishes a permitting system for the discharge of pollutants from point sources.  33 U.S.C. §§ 1311(a), 1342(a).  Under the National Pollutant Discharge Elimination System (NPDES), dischargers must obtain a permit that, among other restrictions, limits the quantity and type of pollutants that can be discharged into a protected body of water.  40 C.F.R. § 122.1(b).  These limits must be "consistent with the assumptions and requirements of any available wasteload allocation for the discharge" set by the relevant TMDL.  *Id.* § 122.44(d)(1)(vii)(B).

Point sources of stormwater discharges, however, are not treated like the mine-run of point sources.  Instead, they are subject to special permitting rules established by a 1987 amendment to the CWA.  Under the 1987 amendment, only certain types of stormwater discharge require a permit, most notably those associated with industrial activity and municipal sewer systems.  33 U.S.C. § 1342(p)(2).  The amendment also gave the EPA the authority to identify and regulate other sources of stormwater discharge.  *Id.* § 1342(p)(6).  Exercising this authority, the EPA added two types of

stormwater discharges to the NPDES permitting system, 40 C.F.R. § 122.26(a)(9)(i)(A), (B), and instituted an ad hoc procedure for permitting where: (1) the EPA[2] "determines that storm water controls are needed for the discharge based on wasteload allocations that are part of 'total maximum daily loads' (TMDLs) that address the pollutant(s) of concern"; or (2) where the EPA "determines that the discharge, or category of discharges within a geographic area, contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." *Id.* § 122.26(a)(9)(i)(C), (D).   These provisions make up the EPA's "residual designation authority" (RDA).

Plaintiffs contend that under the RDA, the EPA is required to take urgent action to address stormwater discharges into the Charles River. Plaintiffs point to three Charles River TMDLs approved by the EPA in recent years.   The first two TMDLs address "nutrient" pollution in the Charles. These TMDLs divide the Charles into two stretches: the Upper/Middle Charles (flowing from Hopkinton to the Watertown Dam), and the Lower Charles (flowing from the Watertown Dam to the New Charles River Dam).

---

[2] Under the CWA, states can create their own NPDES permitting authority under the auspices of the EPA and take responsibility for determining when permits are needed for stormwater discharges. *See* 33 U.S.C. § 1342(b).  Massachusetts to this point has opted not to create its own permitting process.

In both stretches, nutrient pollution (primarily from phosphorus) has fostered "cultural" or "accelerated eutrophication," a process by which a body of water produces overabundant plant life, including toxic algae, thereby degrading water quality and deterring recreational use.  Defs.' Ex. 1, Dkt. #22-2, at 5-6, 19-20; Defs.' Ex. 2, Dkt. # 22-3, at 2, 13-14.  Both TMDLs identify stormwater as a major source of nutrient discharge into the Charles. Defs.' Ex. 1 at 43; Defs.' Ex. 2 at 46-51.

The third TMDL addresses pathogen pollution, including bacteria such as fecal coliform and *E. coli.*  Pathogens endanger the health of persons who drink or are otherwise exposed to the polluted water.  Defs.' Ex. 3, Dkt. #22-4, at 3.  The TMDL identifies stormwater as a major source of pathogens, primarily because it washes animal waste and other pathogen hosts into the Charles.  *Id.* at 39.

All three TMDLs and the recitations in plaintiffs' Complaint identify significant threats to the vitality of the Charles — the amelioration of which will require severe reductions in the levels of nutrient and pathogen pollution contributed to the River by stormwater.  Nutrient pollution has caused toxic algal blooms in the Charles, leading state and local authorities to warn citizens and their pets to avoid any contact with River water.  Am. Compl. ¶¶ 48, 81.  Plaintiffs also note that high levels of pathogen pollution have forced

the cancellation of public swimming events.  Am. Compl. ¶ 52.  The Lower Charles nutrient TMDL implementation plan will require "Commercial," "Industrial," and "High Density Residential" land users to reduce phosphorous loading by 65% from 1998-2002 levels, while cities and towns along the Charles will be required to achieve reductions in excess of 60% of 1998-2002 levels.  Defs.' Ex. 1 at 106-112.  The implementation plan for the Upper/Middle Charles nutrient TMDL also calls for severe reductions in nutrient contributions by "Commercial/Industrial/Transportation" and "High Density/Medium Density/Multi-Family Residential" land users on "the same [scale] as those called for in the Lower Charles Nutrient TMDL." Defs.' Ex. 2 at 84.  The pathogen TMDL, for its part, envisions reductions of 41.2%-98.8% in bacteria loading and reductions of 97.1%-97.6% in fecal coliform loading for comparable land use categories.  Defs.' Ex. 3 at 40.

Plaintiffs filed this lawsuit on February 25, 2016, and amended the Complaint on June 20, 2016.  The court heard oral argument on the EPA's motion to dismiss on February 3, 2017.  At the conclusion of the argument, the court invited additional comments concerning the relationship between this suit and the citizen petition provision of the EPA's regulations implementing the RDA.  *See* 40 C.F.R. § 122.26(f)(2).  Both parties responded, and plaintiffs, together with their response, sought leave to add

an additional count to the Complaint.  That count would assert that the EPA has failed to fulfill the nondiscretionary duty imposed under the RDA to make a final determination on citizen petitions for point source designations within 90 days of receipt.  *See id.* § 122.26(f)(5).  Specifically, plaintiffs contend that the EPA has yet to issue a final determination on a petition filed on July 10, 2013, requesting the EPA to require permits for commercial, industrial, and institutional stormwater discharges at some 1,711 locations in New England.

## DISCUSSION

Relying on the citizen suit provision of the CWA, 33 U.S.C. § 1365, plaintiffs allege that the EPA has failed under 40 C.F.R. § 124.52 to distribute NPDES permit applications to various commercial, industrial, institutional, and high-density residential stormwater point sources along the Charles (the EPA does not contest the fact that it has not done so).  The essence of plaintiffs' argument is that the EPA, in approving the Charles River TMDLs, made an implicit determination under its RDA that stormwater dischargers along the River must obtain NPDES permits.

As a general proposition, sovereign immunity bars suits against federal agencies and their officials.  *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 57 (1st Cir. 2007).  Congress may waive that immunity, and it

has done so under the CWA to the extent that citizens are authorized to bring suits to compel the EPA Administrator to carry out "any act or duty . . . which is not discretionary." 33 U.S.C. § 1365(a)(2). Stated in the obverse, "[a] clearly mandated, nondiscretionary duty imposed on the Administrator is a prerequisite for federal jurisdiction under the CWA citizen suit provision." *Miccosukee Tribe of Indians of Fl. v. U.S. E.P.A.*, 105 F.3d 599, 602 (11th Cir. 1997); *accord Sierra Club v. Whitman*, 268 F.3d 898, 901 (9th Cir. 2001).

The jurisdictional question in this case turns on the contextual meaning of the word "determines" as it appears in the RDA. 40 C.F.R. § 122.26(a)(9)(i)(C), (D). Plaintiffs maintain that the EPA, by approving the TMDLs at issue, made the necessary determinations. Plaintiffs emphasize that the process of approving a TMDL necessarily involves reviewing and approving the underlying load and wasteload allocations for nonpoint and point sources, respectively. All three TMDLs include stormwater flows (in whole or in part) in their wasteload allocations, implying that at least some stormwater comes from point sources. Defs.' Ex. 1 at 88; Defs.' Ex. 2 at 74-75; Defs.' Ex. 3 at 58. Moreover, plaintiffs point to the findings in the TMDLs or their implementation plans regarding phosphorous and pathogen loading contributed by stormwater runoff from various land uses and the setting of concrete goals for the containment and reduction of these contributions.

Defs.' Ex. 1 at 99-104; Defs.' Ex. 2 at 75; Defs.' Ex. 3 at 39-40.  Thus, the argument goes, the TMDLs, with their underlying wasteload allocations and targeted reductions in contaminants, amount to a determination that unpermitted stormwater discharges are contributing to violations of water quality standards.[3]  It follows, plaintiffs assert, that the EPA must carry out its duty to "notify the discharger in writing" of its determination and "send [a permit] application form with the notice."  40 C.F.R. § 124.52(b).

Under plaintiffs' theory, a nondiscretionary duty logically attaches if the TMDLs constitute determinations under the RDA. The EPA sees this argument as the weak link in plaintiffs' logical chain.  Although the EPA acknowledges that the TMDL process results in the identification of sources of pollution of bodies of water, and even further, that a TMDL could provide

---

[3] Plaintiffs rest their argument on both subsections (C) and (D) of the RDA.  The precise relationship between these provisions is unclear.  Subsection (C) describes determinations "based on wasteload allocations that are part of 'total maximum daily loads' (TMDLs) that address the pollutant(s) of concern," while subsection (D) refers generally to determinations that a discharge "contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States."  40 C.F.R. § 122.26(a)(9)(i)(C), (D).  At oral argument, the EPA stated that reading (D) to apply only to waters without an approved TMDL would be reasonable, though it did not advance that reading as an authoritative interpretation.  Plaintiffs contended that the two provisions are overlapping in their application to waters (like the Charles) for which approved TMDLs are in place.  As this case ultimately turns on the meaning of "determines," which appears in both parts of the RDA, the court need not conclusively determine the interplay of subsections (C) and (D).

a basis on which the EPA could exercise its RDA, that exercise, in the EPA's view, requires an "express determination" resulting from an "affirmative exercise[]" of the RDA that is independent of the TMDL process.  Defs.' Mem. at 14; *see* Reply at 2-3.

Here is the crux of the matter.  While an agency cannot take a position which contradicts the plain text of a regulation, *see United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 33 (1st Cir. 2011), an agency's interpretation of its own regulations is generally "controlling unless 'plainly erroneous or inconsistent with the regulation,'" *Auer v. Robbins*, 519 U.S. 452, 461 (1997), quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989).  This is true even if the agency interpretation appears for the first time in a legal brief.  *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208-209 (2011).[4]

Plaintiffs contend that the EPA's interpretation of the exercise of RDA contradicts the regulation itself and the underlying statutory authority upon which it draws.  Specifically, plaintiffs maintain that "determines" means

---

[4] The court is not required, however, to defer to agency interpretations that conflict with a prior authoritative interpretation, advocate a position only to gain advantage in a particular litigation, or represent a transparent attempt to rationalize some previous agency action. *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-2167 (2012).

that NPDES permits for stormwater are required "whenever EPA *substantively* determines that the permit triggers are met, regardless of the *process* leading to that conclusion." Opp'n at 9. In support of this argument, plaintiffs place particular emphasis on the fact that the regulations and the CWA use the word "determines," rather than the phrase, "makes a determination" (which plaintiffs agree would imply the existence of an independent process for exercising the RDA). But given the actual word used, they argue that the EPA has no "discretion to impose additional *ad hoc* procedural hurdles or distinctions" to the exercise. *Id.*

Nothing in the plain text of the CWA or regulations, however, precludes the EPA's reading. As plaintiffs concede, neither source explicitly speaks to how the RDA is to be exercised. *Id.* Nor is their reading of "determines" so plainly obvious when the regulation is read, as it must be, as a whole. Although in an appropriate context, meaning might be ascribed to the EPA's choice of "determines" rather than "makes a determination," any interpretive weight given to that choice is outweighed by the sole reference to the TMDL procedure in the RDA. 40 C.F.R. § 122.26(a)(9)(i)(C) provides that an RDA determination may be "based on wasteload allocations that are part of 'total maximum daily loads' (TMDLs) that address the pollutant(s) of concern." This language clearly implies that the RDA will be exercised separately from

the TMDL process; it would be an oddity, if not an outright oxymoron, to say that a determination is "based on" a TMDL's wasteload allocations if the TMDL itself constitutes the determination.  At best, plaintiffs' argument demonstrates that the meaning of "determines" is ambiguous, which renders the EPA's interpretation of the term, which is not outlandish or unreasonable, the tiebreaker for the court.  *See Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72-73 (1st Cir. 2006).

In addition to the textual cues, the EPA's reading comports with other aspects of the statutory treatment of wastewater discharges and the TMDL process.  Unlike most discharges, which are subject to a default rule requiring NPDES permits, *see* 33 U.S.C. §§ 1311(a), 1342(a), the CWA itself requires permits only for certain statutorily designated stormwater sources, *id.* § 1342(p)(1)-(2).  The statute also tasks the EPA with identifying additional stormwater discharges and establishing "a comprehensive program to regulate such designated sources."  *Id.* § 1342(p)(6).  The EPA subsequently designated two such sources, and also created the RDA to retain the flexibility to require permits on an ad hoc basis.  40 C.F.R. § 122.26(a)(9)(i).  Viewing the statutorily mandated creation of a TMDL as constituting a determination under the RDA would collapse the distinction between the largely discretionary stormwater permitting system envisioned by Congress

and the default rule requiring permits from other discharges.  *Cf. Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1338 (2013) (the CWA gives the EPA "broad discretion . . . in the realm of stormwater runoff").

This conclusion is strengthened by the fact that courts have regularly held that TMDLs, standing alone, do not create legally enforceable obligations (albeit in addressing different questions under the CWA).  *See Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281, 291 & n.4 (3d Cir. 2015) (collecting cases), *cert. denied*, 136 S. Ct. 1246 (2016).  This approach makes sense because under the CWA and its implementing regulations, a TMDL sets the total load of a given pollutant that a waterbody can sustain and then divides that amount between point and nonpoint sources.   33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(a), (c)(1).  These conclusions inform the state's water quality management plan, which in turn is "used to direct implementation" of the steps needed to bring degraded waterbodies into compliance.  40 C.F.R. § 130.6(b); *see id.* § 130.7(d)(2).  Thus, although the purpose of a TMDL is to evaluate sources of water pollution, there is nothing leading inexorably to the conclusion that the analysis underlying a TMDL is itself a determination under the RDA.[5]

---

[5] The parties have treated this case as implicating *Auer* deference, although plaintiffs observe that "determines" appears in the CWA as well.  *See* 33 U.S.C. § 1342(p)(2)(E).  To the extent that plaintiffs suggest that the

Finally, the logic of the EPA's interpretation is reinforced by the TMDLs at issue in this case.  These evince no intention to exercise the RDA.  Although the TMDLs note that stormwater runoff leads to pollution in the Charles River, they do not state that NPDES permits for stormwater discharges are necessary in order to meet water quality targets, nor do they identify a particular category or list of point sources for which permits are required.  *See Conservation Law Found. v. U.S. EPA*, 2016 WL 7217628, at *8-9 (D.R.I. Dec. 13, 2016) (holding that TMDLs in a substantively similar suit by one of the instant plaintiffs did not constitute determinations or an exercise of the EPA's RDA).  All three TMDLs are accompanied by implementation plans that do nothing more than acknowledge the EPA's RDA.  Defs.' Ex. 1 at 113 ("Some stormwater point sources . . . may have to be addressed through other regulatory vehicles available to EPA . . . including, b[u]t not limited to EPA's exercise of its residual designation authority to require NPDES permits . . . ."); *accord* Defs.' Ex. 3 at 69; *see* Defs.' Ex. 2 at 96 ("EPA has the authority to require non-regulated point source storm water discharges to obtain NPDES permits *if it determines* that such storm water discharge causes or contributes to a water quality violation, or is a

---

word "determines" in the CWA is unambiguous at step one of the *Chevron* analysis, that argument fails in view of the statutory context.

significant contributor of pollutants, or where controls are needed based on a waste load allocation . . . ." (emphasis added)); Defs.' Ex. 3 at 74 (same).[6]

Plaintiffs muster two additional arguments against the EPA's brief. First, they argue that the EPA has no consistent practice for invoking its RDA and therefore is not entitled to deference in the matter.  The EPA counters that it has never interpreted a TMDL as constituting a determination under its RDA, Reply at 3, and plaintiffs are hard pressed to say otherwise.  The EPA also provides two examples of determinations made independent of the TMDL process: one in the Long Creek watershed in Maine, and another preliminary determination (never finalized) to exercise the RDA to limit stormwater discharges along the Upper/Middle Charles.  Defs.' Mem. at 14-15, 17 n.16.  These examples are of limited value, as in both cases, while the determinations invoke the RDA, neither affected body of water had an approved TMDL in place.  *See* EPA, Preliminary Residual Designation Pursuant to Clean Water Act, Long Creek (2008), https://www3.epa.gov/region1/npdes/stormwater/assets/pdfs/LongCreek RD.pdf; EPA, Charles River Preliminary Residual Designation Pursuant to

---

[6] The EPA emphasizes that it does not approve or disapprove implementation plans, although they do inform its approval of the overall TMDL.  Defs.' Ex. 4, Dkt. #22-5, at 19, 21, 22; Defs.' Ex. 5, Dkt. #22-6, at 11; Defs.' Ex. 6, Dkt. #22-7, § 9.

Clean Water Act (2008), https://www.epa.gov/sites/production/files/2015-03/documents/rodfinalnov12.pdf.    Nevertheless,   the   mostly   empty historical record is of no help to plaintiffs.   The relevant question is not whether the EPA has a long history of exercising the RDA, but whether its past practice conflicts with its present interpretation or demonstrates that the EPA's interpretation is a *post hoc* rationalization of its prior behavior. *See SmithKline Beecham*, 132 S. Ct. at 2166-2167.   Neither is the case here; the fact that the EPA has not previously viewed the approval of a TMDL as an exercise of the RDA demonstrates consistency, not conflict.  *See Decker*, 133 S. Ct. at 1337-1338.

Second, plaintiffs rely on a decision of the Vermont Environmental Board involving NPDES permits for stormwater dischargers, *In re Stormwater NPDES Petition*, 2008 WL 4097449 (Vt. Envtl. Bd. Aug. 28, 2008).   In that case, the Board ordered the Vermont Agency of Natural Resources (ANR) to determine which stormwater point sources in certain watersheds were required to obtain NPDES permits.  *Id.* at *25-26.   In particular, plaintiffs focus on language from the Board's opinion emphasizing that the duty to require permits is nondiscretionary once a determination has been made that a stormwater source is a contributor to water quality violations.  *Id.* at *23 ("[O]nce the currently unregulated

discharges that contribute pollutants are identified, exercise of RDA is not optional.").

The Vermont decision does not take plaintiffs very far.  The Board did not hold that the relevant TMDLs, standing alone, constituted an exercise of the RDA.  Nor did it address the question of whether a determination under the RDA is a procedure separate from the TMDL process.  This is likely explained by the fact that the case arose as an appeal from the ANR's denial (for the second time) of a citizen petition seeking the issuance of NPDES permits for the affected bodies of water — a petition authorized by EPA regulations.  *Id.* at \*3-5; *see* 40 C.F.R. § 122.26(f)(2).  The ANR was under instructions from the Vermont Supreme Court to undertake a fact-specific inquiry in response to the petition to determine whether each discharge identified in the petition contributed to a water quality violation (and thus required an NPDES permit).  *In re Stormwater NPDES Petition*, 2008 WL 4097449, at \*19-20.  In other words, the Board's order simply skipped over the first stage of the EPA's internal process.[7]

--------

[7] Even if the Board's decision had addressed the question of what procedure is envisioned by the RDA, that decision would be entitled to minimal weight in this court's analysis.  Pursuant to Vermont law, the Board exercised *de novo* review of the ANR's interpretation of federal law and federal regulations, affording the agency no deference.  *In re Stormwater NPDES Petition*, 2008 WL 4097449, at \*16.  Here, however, for the reasons

This leaves plaintiffs' motion to amend.  Leave to amend at this stage of the litigation should be freely given, *see* Fed. R. Civ. P. 15(a)(2), unless in the totality of the circumstances, the court concludes that the request is unduly delayed, made in bad faith, futile, or reflects an absence of due diligence by the moving party, *Palmer v. Champion Mortg.*, 465 F.3d 24, 30-31 (1st Cir. 2006).

On July 10, 2013, plaintiff Conservation Law Foundation, in conjunction with two other environmental organizations, submitted a citizen petition pursuant to EPA regulation 40 C.F.R. § 122.26(f)(2), requesting that the EPA exercise its RDA over commercial, industrial, and institutional "non-*de minimis*" stormwater discharges in a large swath of waters throughout New England, including the Charles.  Dkt. #51-2 at 2, 11.  The petition identified a range of pollutants of concern, including nutrients.  Dkt. #51-2 at 11-20.  The EPA is formally required to issue a final decision on such petitions within 90 days of receipt.  *Id.* § 122.26(f)(5).  The EPA Region I Office responded to the petition several months later on March 11, 2014, declaring that it was "neither granting the petition as it is currently framed, nor is it denying the petition."  Dkt. #45-2 at 2.  Instead, the EPA announced

---

explained above, the EPA is entitled under controlling law to deference in interpreting its own regulations.

its intention "to evaluate individual watersheds, focusing on the nature of the impairment and the extent to which stormwater discharges from [commercial, industrial, and institutional] sites are contributing to any such impairment, to determine whether and the extent to which exercise of RDA is appropriate." *Id.* Plaintiffs' proposed amendment adds a claim that the EPA failed to issue a final decision on the 2013 petition within the mandated 90-day period or since.

A prerequisite to the waiver of sovereign immunity in the CWA's citizen suit provision is that a plaintiff cannot bring suit until 60 days after providing notice to the EPA Administrator of the alleged failure to fulfill a nondiscretionary duty. *See* 33 U.S.C. § 1365(b)(2); *Paolino v. JF Realty, LLC*, 710 F.3d 31, 36 n.4 (1st Cir. 2013) (satisfaction of the notice requirement is a "mandatory condition[] precedent to the filing of a citizen suit"). EPA regulations require that the notice "describe with reasonable specificity the action taken or not taken by the Administrator which is alleged to constitute a failure to perform such act or duty." 40 C.F.R. § 135.3(b).

Plaintiffs suggest that they satisfied this requirement by means of the notice of suit that authorized the filing of this case. That notice, however, asserted that the EPA had failed to render a final decision on a petition plaintiffs submitted in February of 2009. Dkt. #48-1 at 1-2, 7. The 2009

petition requested that the EPA exercise its RDA on all commercial, industrial, institutional, and high-density residential sources of stormwater discharges that contain one acre or more of impervious surface area located within the Charles River watershed.  *Id.* at 1, 7; Dkt. #51-2 at 2.  Plaintiffs withdrew the petition by letter dated February 25, 2016 (the same day this suit was filed), Dkt. #48-2 at 1, which may explain why no claim based on that petition was brought in this case.  The letter of notice made no mention of the 2013 petition described in the proposed new count.

While plaintiffs object to any elevation of form over substance, this unfairly devalues the importance of the notice obligation.   Many environmental statutes contain an identical 60-day notice requirement, and the Supreme Court has made clear that notice serves two valuable purposes. First, the notice requirement "allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits."  *Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989).  Second, the notice requirement "gives the alleged violator 'an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'"  *Id.*, quoting *Gwaltney of Smithfield, Inc. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987).

The second purpose is controlling here.  Where the EPA faces a suit premised on its failure to fulfill a nondiscretionary duty, it deserves notice of the duty it is alleged to have abdicated and the action sought by the prospective plaintiff so that it may avoid a suit through compliance.  *See Allegheny Cty. Sanitary Auth. v. U.S. E.P.A.*, 732 F.2d 1167, 1177 (3d Cir. 1984).  The notice given in this case, which focused on the 2009 petition, did not provide "reasonable notice" of a claim based on the Administrator's alleged failure to act on the 2013 petition.  40 C.F.R. § 135.3(b).  The 2013 and 2009 petitions differ in geographic scope, the pollutants identified, the classes of dischargers targeted, the identity of the petitioners, and the procedural posture of the petition before the agency.  The 2013 petition on which plaintiffs now seek to sue does not discuss or identify pathogens as a pollutant of concern, despite the fact that pathogen pollution is the basis for Count III of the original Complaint.  It follows that the proposed amendment would be futile because the notice plaintiffs filed does not inform the Administrator that the claim involves a failure to act on the 2013 petition.

The court concludes by noting that its ruling in favor of the EPA is not necessarily the last word on the matter.  As plaintiffs are well aware, the citizen petition procedure remains open to them.  Both the Long Creek and Vermont designations discussed above were the product of citizen petitions

brought by plaintiff Conservation Law Foundation. Although plaintiffs suggested at oral argument that the 90-day deadline for decisions is frequently ignored by the EPA, there is less justification for delay by the EPA in this instance, where the TMDLs already contain highly detailed information regarding stormwater discharges, their severe impact on the Charles, and the reductions required from major land use categories to achieve water quality standards.[8] In any event, the issue of the EPA's responsiveness is a matter for another day.

ORDER

For the foregoing reasons, plaintiffs' motion to amend is <u>DENIED</u>. The EPA's motion to dismiss for lack of subject matter jurisdiction is <u>ALLOWED</u> without prejudice. The clerk will enter the dismissal and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[8] The court also observes that the citizen petition procedure has the benefit of allowing public comment on a proposed exercise by the EPA of its RDA. *See, e.g.*, Long Creek Preliminary Residual Determination at 1.